1
2
3
4
5
6
7
8

9                                UNITED STATES DISTRICT COURT

10                        FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12 UNITED STATES OF AMERICA,          No.  2:98-cr-0114 KJM DAD P

13              Petitioner,

14     v.                            <u>ORDER AND</u>

15 D'ANGELO DOMINICO DAVIS,        <u>FINDINGS AND RECOMMENDATIONS</u>

16              Respondent.

17

18       Movant is a federal prisoner proceeding through counsel with an amended motion to

19 vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Movant was convicted of

20 armed credit union and bank robberies with the use of a firearm during and in relation to those

21 robberies.  He now seeks post-conviction relief on the following grounds:  (1) he is innocent of

22 the charges upon which he was convicted; (2) his counsel rendered ineffective assistance; (3) his

23 conviction is the result of prosecutorial misconduct; and (4) his sentence violates his federal

24 constitutional rights to due process and "equal treatment."  Upon careful consideration of the

25 record and the applicable law, the undersigned recommends that movant's § 2255 motion be

26 denied.

27 /////

28 /////

<div align="center">1</div>

**I. Procedural Background**

Movant was charged in a second superseding indictment filed on August 9, 2000 with: (1) three counts of credit union robbery, in violation of 18 U.S.C. §§ 2113(a) and (d) (Counts 1 (Golden One Credit Union), 3 (First Federal Credit Union), and 7 (Schools Federal Credit Union)); (2) one count of bank robbery, in violation of 18 U.S.C. §§2113(a) and (d) (count  5 (U.S. Bank)); (3) one count of attempted armed credit union robbery, in violation of 18 U.S.C. §§ 2113(a) and (d) (Count 9); and (4) five counts of using or carrying a firearm in connection with all of the crimes listed above, in violation of 18 U.S.C. § 924(c)(1) (Counts 2, 4, 6, 8, and 10). (ECF No. 29.)  Jury trial commenced on September 3, 2002.  (ECF No. 112.)   At the conclusion of the evidence, the jury convicted movant on Counts 1 through 8 and acquitted him on Counts 9 and 10 of the second superseding indictment.  (ECF No. 140.)

On January 13, 2003, the District Court sentenced movant to concurrent 188 month sentences on Counts 1, 3, 5, and 7; 60 months on Count 2; and 240 months each on Counts 4, 6, and 8, to run consecutively to each other and to counts 1, 3, 5, and 7, for a total aggregate term of 968 months in the custody of the Bureau of Prisons.  (ECF No. 161.)

On appeal of movant's judgment of conviction, the Ninth Circuit Court of Appeals held that the evidence introduced at his trial was insufficient to support movant's conviction on Count 4 for using or carrying a firearm in relation to the First Federal Credit Union robbery.  The Court of Appeals remanded the case to the District Court with instructions to modify the judgment by striking the sentence and conviction as to Count 4 and to determine, pursuant to the decision in United States v. Ameline, 409 F.3d 1073, 1085 (9th Cir. 2005), whether the District Judge would have imposed the same sentence had he been aware that the U.S. Sentencing Guidelines were advisory rather than mandatory.  United States v. Davis, No. 03-10028, 138 Fed. Appx. 914 (9th Cir. July 5, 2005).

On August 14, 2006, the District Court struck movant's conviction and sentence as to count four and declared that it would not have imposed a different sentence on movant had it known that the Sentencing Guidelines were advisory.  The court resentenced movant to 300 months imprisonment on each of Counts 1, 3, 5, and 7, with the sentences on Counts 1, 3, and 5

1    to be served concurrently to each other.  As to count 7, the court sentenced movant to 273 months

2    in the custody of the Bureau of Prisons with that sentence to run concurrently with the sentences

3    imposed on Counts 1, 3, and 5, and 27 months to run consecutively to Counts 1, 3, and 5, for a

4    total term of imprisonment on Counts 1, 3, 5, and 7 of 327 months.  The court also sentenced

5    movant to 60 months imprisonment on Count 2 and 240 months imprisonment on each of Counts

6    6 and 8, with those sentences to run consecutively to each other, for a total term of imprisonment

7    on Counts 2, 6, and 8 of 540 months.  Thus, movant was resentenced to a total aggregate term of

8    imprisonment of 867 months in the custody of the Bureau of Prisons.  (ECF No. 211.)

9        Movant again appealed following his re-sentencing after remand.  (ECF No. 210.)  On

10   appeal, the Ninth Circuit vacated the District Court's sentence of 867 months imprisonment and

11   directed the District Court to reimpose movant's original sentence, but not to impose any sentence

12   on the dismissed Count 4.  (ECF No. 224.)  On April 13, 2009, pursuant to the mandate of the

13   Court of Appeals, the District Court resentenced movant to 188 months imprisonment on each of

14   Counts 1, 3, 5, and 7, with those sentences to be served concurrently to each other, for a total term

15   of 188 months on those counts.  The District Court also sentenced movant to 60 months

16   imprisonment on Count 2 and 240 months imprisonment on each of Counts 6 and 8, with those

17   sentences to be served consecutively to each other, for a total term of 540 months in prison on

18   Counts 2, 6, and 8.  The District Court ordered the sentence imposed on counts 2, 6, and 8 to be

19   served consecutively to the sentences imposed with respect to Counts 1, 3, 5, and 7.  As a result,

20   movant received a total aggregate sentence of 728 months in the custody of the Bureau of Prisons.

21   (ECF No. 245.)

22   **II.  Factual Background**

23       The following trial testimony and other evidence submitted by movant in support of his

24   pending § 2255 motion provides the following factual background to his claims now before this

25   court.

26       **A.  Testimony of William Hernandez**

27       William Hernandez provided the following testimony for the defense at movant's trial.

28   On December 7, 1995, Hernandez was working at a restaurant located next door to the Golden

3

One Credit Union in Sacramento.  ((Reporter's Transcript on Appeal (RT) at 1590.)  On that day he observed a burgundy van driving around the parking lot.  (Id. at 1591.)  He was blowing leaves and dirt off the parking lot and was trying to work and keep his eyes on the driver of the van at the same time.  (Id.)  He watched the driver of the van for about 15 minutes.  (Id.)  Part of the driver's face was covered with a hat.  (Id. at 1598.)  When the van was at the corner of the parking lot between the restaurant and the credit union, he saw two people get into the van which then left the parking lot.  (Id. at 1591-92.)  Approximately 15 minutes later, several police officers arrived and asked Hernandez if he had seen anyone at the bank.  (Id. at 1593.)  He told the police officers that he could identify the driver of the van he had seen.  (Id. at 1593-94.)  However, when he was asked at movant's trial whether he believed he had gotten a good enough look at the van's driver to identify him, Hernandez testified, "I was very nervous.  I can't tell."  (Id.)

On July 21, 1997, Hernandez was shown a photo lineup that included a photograph of movant Davis.  (Id. at 1598.)  He was not able to identify anyone in that lineup as the driver of the van.  (Id.)  Several weeks later, on August 8, 1997, Hernandez was shown another photographic lineup.  This time, he identified a person who looked to him like the driver of the van.  (Id. at 1594.)  When he first looked at this second lineup, he "shook [his] head saying no, and then [he] pointed to number three saying number three looked like him; but [he] thought the individual driving the van was younger."  (Id. at 1597.)  Hernandez informed the police officer who was present at the lineup that "he looks like him, but I wasn't sure."  (Id. at 1595.)  The person Mr. Hernandez picked out of the lineup was Terry Amons.[1]

Mr. Hernandez testified at movant's trial that he couldn't remember exact details of the photo lineup he had viewed because "it's very hard for me – seven years.  I can't remember."  (Id. at 1595.)  When asked whether "as you sit here today reflecting back over six years ago, almost seven years ago could you identify the person that was driving the van," Mr. Hernandez stated, "I don't think so."  (Id. at 1597.)

---

[1]  Mr. Amons testified at movant's trial that he stole the getaway car that was used in the Golden One robbery.  (Id. at 616-17.)  He denied that he was otherwise involved in the robberies of the Golden One Credit Union or First Federal Credit Union.  (Id.)  The defense did not cross-examine Amons.

**B. Testimony of Marcel Swift**

Marcel Swift was called as a witness by the prosecution at movant's trial and testified that he had participated in the robberies of the Golden One Federal Credit Union on December 7, 1995, and the First Federal Credit Union on December 12, 1995, along with movant, Jason Smith, and Andre Robinson. (Id. at 1509-10.) Swift also testified that he participated in the robbery of the U.S. Bank on February 20, 1996, along with movant, Erik Chukes, and Andre Robinson. (Id. at 1510.)

Swift testified that prior to the robbery of the Golden One Credit Union, he met with movant, Andre Robinson, and Jason Smith at Andre Robinson's apartment to discuss "what we was going to do, who was going to do what . . . ." (Id. at 1511.) He testified that both he and movant brought a MAC-11[2] firearm to that meeting, presumably for use in that robbery. (Id. at 1511-12.)

In his testimony Mr. Swift explained that a planning meeting was also held prior to the robbery of the First Federal Credit Union. This meeting was attended by Jason Smith, Andre Robinson, and movant. (Id.at 1516.) Swift testified that both he and Jason Smith brought guns to the pre-meeting and that "everybody knew" that guns would be used to facilitate that robbery. (Id. at 1516-17.) Swift identified movant's role in that robbery as driving the getaway car (a stolen van). (Id. at 1515-16.) Swift also testified that both he and Jason Smith were armed during the First Federal Credit Union robbery. (Id. at 1515, 1517.) According to Swift, after the robbery of the First Federal Credit Union the stolen money was divided among all the participants. (Id. at 1518-19.)

Mr. Swift also testified that movant entered the U.S. Bank with him and participated in the robbery of that bank. (Id. at 1519.) According to Swift, movant was carrying either a MAC-11 or a 380 firearm and Swift was armed with the other. (Id. at 1520.) Swift stated that Erik Chukes

---

[2] A Military Armament Corporation Model 11, often referred to as a MAC-11, is a subcompact machine pistol. An ATF Firearms Instruction Coordinator testified at trial that the MAC-type weapon used in these robberies was actually manufactured by Sylvia and Wayne Daniels (SWD). (RT at 1277, 1280.) The trial transcript erroneously refers in many instances to such a weapon as a "Mack." These findings and recommendations refer to the firearm by its proper name.

1    drove the getaway van in connection with that robbery.  (Id. at 1521.)  Mr. Swift had originally

2    told authorities that Terry Amons had committed the robberies instead of movant.  (Id. at 1542,

3    1543, 1546.)  However, Swift testified at movant's trial that he had been lying during those

4    previous interviews because he was afraid for the safety of his family if he implicated movant in

5    the robberies.  (Id. at 1524-25.)

6        **C. Testimony of Andre Robinson**

7        Andre Robinson was called as a witness by the prosecution at movant's trial and testified

8    as follows.  On December 7, 1995, Robinson participated in the robbery of the Golden One Credit

9    Union with Jason Smith, Marcel Swift, and movant.  (Id. at 505-13.)  Movant was the driver of

10   the stolen getaway van.  (Id. at 508.)   Although guns were involved in the robbery, Robinson did

11   not remember who brought them or exactly what type of guns they were.  (Id. at 509.)  One of the

12   guns used in connection with that robbery was a semiautomatic handgun.  (Id.)  After the robbery,

13   all of the participants counted and divided the stolen money.

14       Robinson also participated in the robbery of the First Federal Credit union on December

15   12, 1995, with movant, Jason Smith, and Marcel Swift.  (Id. at 513-19.)  According to Robinson,

16   a semi-automatic handgun and a machine gun, the latter being either a MAC-11 or an Uzi, were

17   used in that robbery.  (Id.at 515.)  Movant drove the stolen getaway van, but did not enter the

18   credit union.  (Id. at 516-17.)  After the robbery, all of the participants, including movant, drove

19   back to Robinson's apartment, counted the stolen money, and distributed it amongst themselves,

20   with movant, Smith and Swift receiving the bulk of the robbery proceeds.  (Id. at 518-19.)

21       Mr. Robinson participated in the robbery of the U.S. Bank on February 20, 1996, along

22   with movant, Marcel Swift and Erik Chukes.  (Id. at 519-29 .)  Robinson saw movant holding the

23   machine gun (either a MAC-11 or an Uzi) firearm just prior to that robbery and Swift holding the

24   semi-automatic handgun.  (Id. at 526.)  Swift and movant were the ones who entered the bank in

25   connection with this robbery.  (Id. at 527.)  After the robbery, the participants divided the stolen

26   money, with movant and Marcel Swift getting the bulk of it.  (Id. at 528.)

27       Finally, Robinson participated in the robbery of the Schools Federal Credit Union on July

28   30, 1996, along with movant, Martin Connors, and a man named Wayne.  (Id. at 530, 539- 44.)

1   At the pre-meeting for this robbery, the same two guns were present and the plan was for Connors

2   and movant to enter the bank and carry out the robbery with the other two serving as drivers.  .

3   (Id. at 5541-42.)  After the robbery, the participants divided the money, with movant getting the

4   bulk of the proceeds.  (Id. at 544.)

5     Robinson testified that he did not implicate movant in the bank and credit union robberies

6   the first time he was contacted by federal law enforcement authorities because he was afraid for

7   his safety and the safety of his family if he did so.  (RT at 502-04.)  Instead, he told authorities

8   that Terry Amons committed the robberies in place of movant.  (Id. at 566-67.)

9     **D.  Testimony of Antonio Servidio**

10     Antonio Servidio was called as a witness for the prosecution at movant's trial and testified

11   to the following.  Servidio was in the business of purchasing firearms illegally through a "straw

12   purchaser" or "middle man" and then selling those firearms.  (RT at 465-66.)  In 1995, he bought

13   a gun for movant Davis after being informed by Twan Landers (movant's cousin) that movant

14   wanted a firearm.  (Id. at 467-68.)  Landers informed Servidio that movant wanted a "MAC-12."

15   (Id. at 468.)[3]   In response to this information, Servidio bought a MAC-12 through a straw

16   purchaser and took it to Landers' house, where movant, Landers, and several others were present.

17   (Id. at 470.)  According to Servidio, he negotiated the price of the MAC-12 and sold it to movant

18   for $400 or $500 in cash.  (Id. at 470-71.)  Prior to this transaction, Servidio had seen movant

19   Davis in the neighborhood between fifty and one hundred times.  (Id. at 471.)  Servidio tried to

20   sell movant other guns as well, but he was not interested in buying them.  (Id.)

21   /////

22   _____

[3]  The ATF Firearms Instruction Coordinator who testified at movant's trial identified the firearm
23   that was introduced into evidence as a SWD M-11 or MAC-11 fully automatic machine pistol.
(RT at 1282.)  The agent explained that a MAC-11 is a nine millimeter, a MAC-12 is a 380
24   caliber and is slightly smaller, and a MAC-10 is a 45 caliber and is slightly larger than the other
two but that the three firearms essentially look the same and are unique in the way the barrel
25   protrudes from the frame of the receiver with respect to all.  (RT at 1282-83, 1285, 1297-99.)
The agent also testified that one of the weapons used in the bank robberies movant was convicted
26   of, as pictured in bank surveillance photograph, to be a "MAC-type" weapon, either a MAC-11 or
a MAC-12.  (RT at 1283, 1301.)  In any event, the undersigned has corrected the erroneous
27   spelling ("Mack") which appears in various pages of the trial transcript in referring to MAC
firearms.
28

When Mr. Servidio was first interviewed by law enforcement officers about his gun sales, he did not mention movant Davis as a person to whom he had sold an illegal firearm.  (Id. at 477-78.)  During his second interview with law enforcement, however, he brought up movant's name because, by that time, he had remembered other gun transactions, including the one involving movant.  (Id. at 478-79, 1179-80.)

**E.  Testimony of Erik Chukes**

Erik Chukes was called as a witness for the prosecution at movant's trial.  His testimony proceeded as follows.  Chukes testified that he had robbed the U.S. Bank.  (Id. at 1210.)  On the morning of that robbery, he attended a meeting with Marcel Swift, Andre Robinson, and a fourth unnamed person at Robinson's apartment.  (Id. at 1210-11.)  When asked whether movant was that fourth person, Chukes stated, "no."  (Id. at 1212.)  At this point in Chukes' testimony, the trial judge allowed the Assistant U.S. Attorney to treat Mr. Chukes as a hostile witness and caused the court clerk to re-administer the oath to the witness.  (Id. at 1213.)  When Chukes refused to identify movant as the fourth person with whom he had committed the robbery of U.S. Bank, the Assistant U.S. Attorney asked him a series of questions regarding an earlier statement Chukes had made to an FBI agent that there were only three people involved in the robbery of the U.S. Bank.  (Id. at 1214-15.)  Chukes admitted that this was a lie, and that four people were involved in that robbery.  (Id. at 1215.)  The prosecutor asked Mr. Chukes whether he refused to identify movant as a participant in the U.S. Bank robbery because he was afraid of him.  (Id.)  Chukes denied that he was afraid of movant.  (Id.)  The prosecutor also asked Chukes to agree that he had told him and the FBI agent during their previous meeting that there were four people involved in the robbery of U.S. Bank but that he was afraid to identify movant as the fourth person because he was in fear for his life.  (Id. at 1219, 1224.)  Chukes denied making such a statement.  (Id.)  When asked why he would have lied in his previous interview with the FBI agent about there being only three participants in the robbery of U.S. Bank if he weren't afraid of movant, Chukes responded:

> A.  Because at that time you kept insisting that Davis was a part of this case, and if I didn't tell you what you wanted to know you was going to give me 35 years in trial [sic].  That's what you told me

8

from day one.

Q. (By the Assistant U.S. Attorney).  Isn't it a fact that no one ever brought Mr. Davis' name up, not myself, not the agent?  No one brought up Mr. Davis' name; isn't that right?

A.  No.  It's a fact that when I came to Sacramento and I had my first attorney, every time my attorney came to see me he had a cooperation deal from you – from you saying that he knows that Davis is a part of this case.  So just save yourself and you can go home in 2002.

Q.  Mr. Chukes, let me stop you right there.  This first interview you hadn't even met me yet.  This interview occurred on November 2nd, 1999.  You hadn't even met me; isn't that a fact?
A.  I hadn't talked to you personally, but all the messages from my first attorney, all the cooperation deals you kept sending through him to me.  And I told him, "Don't keep coming at me trying to cooperate with the Government because I'm not going to lie on somebody that's not a part of my case.

(Id. at 1216.)  Mr. Chukes was thereafter dismissed from the witness stand without being cross-examined by defense counsel.  (Id. at 1227-28.)

### F. Testimony of Martin Connors

Martin Connors was also called as a prosecution witness at movant's trial.  On direct examination, Connors stated that he participated in the robbery of the Schools Federal Credit Union with movant, Andre Robinson, and Roy Howard.  (Id. at 1039.)  He also testified that movant brought a MAC-12 which was used in the robbery and that he and movant entered the credit union with guns and threatened the employees.  (Id. at 1042-43.)  Connors testified that he had entered into a plea agreement with the government wherein, in exchange for a recommended sentence of 180 months in custody and a promise not to charge him with four other bank/credit union robberies, he would plead guilty to robbing a credit union in Napa, California, in 1995.  (Id. at 1044-46.)

At the conclusion of Connors' testimony, the defense was granted a continuance before conducting cross-examination.  (Id. at 1057-58.)  When Connors returned to the witness stand after a weekend recess, he recanted all of his earlier trial testimony and his prior statements to the government.  He testified on cross-examination that the government had put "a lot of pressure" on him and that he "just said whatever I had to say."  (Id. at 1476.)  He further testified that "at this

9

1  point in time now I can't lie on Mr. Davis.  Mr. Davis has done nothing to me." (Id.)  Connors

2  testified that he lied about participating in the Sacramento robberies and about robbing banks in

3  Napa and Vallejo. (Id. at 1486, 1477-78, 1482-87.)  He stated that he lied to law enforcement

4  agents and "just said whatever they wanted to hear" so that he could get a good deal. (Id. at

5  1476-77.)

6      After this testimony by Connor on cross-examination, movant's trial counsel moved for a

7  mistrial. (Id. at 1487.)  The trial court denied the motion for mistrial. (Id.)  Mr. Connors was

8  then excused from the witness stand.  The prosecutor informed the trial court that the FBI would

9  investigate "every aspect of the witness tampering in this case." (Id. at 1488.)  The trial judge

10  observed that Connors had "recanted his testimony, even his testimony with respect to his own

11  plea of guilty, which is difficult to understand if not totally incredible, and I find it incredible."

12  (Id. at 1490.)  Mr. Connors' counsel, who was in the courtroom during his client's testimony,

13  informed the trial judge that he suspected his client had been intimidated over the weekend and

14  had recanted his testimony for that reason. (Id. at 1500-01.)  When Mr. Connors again resumed

15  the witness stand, he informed the trial judge that he would not answer any more questions. (Id.

16  at 1503-04.)  The trial court found Connors in contempt of court and ordered him into custody.

17  (Id. at 1505.)

18      In his closing argument, the Assistant U.S. Attorney argued that Connors had told the

19  truth on direct examination but "on cross-examination something caused him to change his

20  mind." (Id. at 1711-12.)  In his rebuttal argument, the prosecutor contended that Connors had

21  breached his cooperation agreement with the government because he had "lied on cross-

22  examination." (Id. at 1778.)

23      **G.  Affidavit of Latione ("Twan") Landers**

24      In support of the claims presented in the § 2255 motion pending before the court, movant

25  has submitted the declaration of Latione Landers, dated May 22, 2010. (ECF No. 319-2.)

26  Therein, Mr. Landers declares that he was present in the courtroom during the trial testimony of

27  Antonio Servidio, related above, wherein Servidio stated that he sold a firearm to movant at

28  Landers' house. (Id.)  Landers states in his declaration that "There were never any sales of guns

10

at my house.  Servidio tried to sell the guns but I never bought any and D'Angelo Davis was never there."  (Id.)  Landers also declares that he told movant's mother and sister as they were leaving the courthouse on the day of Servidio's testimony that Servidio was "lying."  (Id.) Finally, Landers declares that he was never contacted by an attorney or investigator about this matter.  (Id.)

**H.  Declaration of Jason Ellis Smith**

In a declaration filed with the court by movant on June 3, 2013, Jason Ellis Smith declares as follows:

> 1.  I pled guilty to having committed the armed robbery of the Golden One Credit Union, in Sacramento, California, that happened on December 7, 1995.

> 2.  D'Angelo Davis did not provide the weapons used in the armed robbery of the Golden One Credit Union, in Sacramento, California, that happened on December 7, 1995.

(ECF No. 319-1.)[4]

**I.  Other Evidence Against Movant**

DNA analysis reflected that movant was the source of biological material contained on clothing left in the stolen getaway car after each robbery except the robbery of the First Federal Credit Union.  (ECF No. 317 at 12-13).  Respondent represents, and movant does not deny, that the prosecution also introduced into evidence at movant's trial a letter written by movant to the wife of Jason Smith requesting that she ask Jason Smith to absolve movant of participation in the bank robberies.  (ECF No. 317 at 13.)

/////

/////

---

[4]  Jason Smith's declaration was filed on June 3, 2013, as an attachment to movant's supplemental traverse.  (ECF No. 319-1.)  Movant explains that Smith's declaration was obtained in order to "address the government's assertion that Mr. Landers' declaration was not sufficient to establish actual innocence."  (ECF No. 319 at 29.)  Respondent argues that the Smith declaration is untimely because it was not submitted with movant's original § 2255 motion, is unreliable because it was filed nearly eleven years after movant's trial began, and should be stricken from the record.  (ECF No. 324 at 3-4.)  Assuming arguendo that the Smith declaration is properly before the court, for the reasons explained below, it fails to provide adequate support for movant's claim of actual innocence.

11

1

**III. Applicable Law**

2      A federal prisoner making a collateral attack against the validity of his or her conviction

3 or sentence must do so by way of a motion to vacate, set aside or correct the sentence pursuant to

4 28 U.S.C. § 2255, filed in the court which imposed sentence.  United States v. Monreal, 301 F.3d

5 1127, 1130 (9th Cir. 2002); Tripati v. Henman, 843 F.2d 1160, 1162 (9th Cir. 1988).  Under §

6 2255, the federal sentencing court may grant relief if it concludes that a prisoner in custody was

7 sentenced in violation of the Constitution or laws of the United States.  Davis v. United States,

8 417 U.S. 333, 344-45 (1974); United States v. Barron, 172 F.3d 1153, 1157 (9th Cir. 1999).  To

9 warrant relief, a petitioner must demonstrate the existence of an error of constitutional magnitude

10 which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict.

11 Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also United States v. Montalvo, 331 F.3d

12 1052, 1058 (9th Cir. 2003) ("We hold now that Brecht's harmless error standard applies to habeas

13 cases under section 2255, just as it does to those under section 2254.")  Relief is warranted only

14 where a petitioner has shown "a fundamental defect which inherently results in a complete

15 miscarriage of justice."  Davis, 417 U.S. at 346.  See also United States v. Gianelli, 543 F.3d

16 1178, 1184 (9th Cir. 2008).

17      Under § 2255, "a district court must grant a hearing to determine the validity of a petition

18 brought under that section, '[u]nless the motions and the files and records of the case conclusively

19 show that the prisoner is entitled to no relief.'"  United States v. Blaylock, 20 F.3d 1458, 1465

20 (9th Cir. 1994) (alteration in original) (quoting 28 U.S.C. § 2255).  The court may deny a hearing

21 if the movant's allegations, viewed against the record, fail to state a claim for relief or "are so

22 palpably incredible or patently frivolous as to warrant summary dismissal."  United States v.

23 McMullen, 98 F.3d 1155, 1159 (9th Cir. 1996) (internal quotation marks omitted). See also

24 United States v. Withers, 638 F.3d 1055, 1062-63 (9th Cir. 2011); United States v. Leonti, 326

25 F.3d 1111, 1116 (9th Cir. 2003).  To warrant a hearing, therefore, the movant must make specific

26 factual allegations which, if true, would entitle him to relief.  Withers, 638 F.3d at 1062;

27 McMullen, 98 F.3d at 1159.  Mere conclusory assertions in a § 2255 motion are insufficient,

28 without more, to require a hearing.  United States v. Hearst, 638 F.2d 1190, 1194 (9th Cir.1980).

**IV.  Movant's Claims**

    **A.  Overview**

       In a preface to his four enumerated claims, movant included in his successful motion to amend a section entitled "overview."  (ECF No. 303-2 at 6.)  Therein, movant explained that he was unable to obtain his trial counsel's records because those records were "destroyed."  (Id.) Movant states that the destruction of these records "caused significant difficulty" in evaluating the claims for relief to be included in the motion now pending before this court.  (Id.)  Movant further explained that after he filed his § 2255 motion, the prosecutor assisted his current counsel in obtaining some of the lost records and also provided him access to the trial exhibits.  (Id.) However, according to movant, "an on-going dispute" about full access to other relevant records still exists between the parties.  (Id.)

       Movant asserts that full access to all relevant information would allow him to "potentially" provide this court with evidence in support of the claims for relief now set forth in the instant § 2255 motion.  (Id. at 6-7.)  He argues that because his trial counsel's file has been destroyed, an evidentiary hearing should be held at which he and his trial counsel would testify, along with witnesses Jason Smith, Marcel Swift, Antonio Servidio, and Latione Landers.  (Id. at 7; ECF No. 319 at 7.)  Movant provides a list of general subject areas he would like authority to "subpoena records and witnesses" regarding.  (ECF No. 303-2 at 20.)  Those areas include: (1) "Phone records, bank records and other records that keep track of the exact date and time of a particular transaction," in order to "dispute the testimony presented, and to support the defense claim that Mr. Davis is actually innocent;" (2) records that might demonstrate whether "witnesses against Mr. Davis" had a motive to falsely implicate him in these crimes "from the prior juvenile incident or from some other long-running grudge;" and (3) records that might demonstrate "trial counsel's reasoning for his tactical and strategical decisions."  (Id. at 20-21.)

    **B.  Claim of Actual Innocence**

       In his first ground for relief, movant claims that he is "actually innocent" of all of the crimes for which he has been convicted.  Movant bases this claim on purportedly new evidence in the form of the affidavits of Latione Landers and Jason Ellis Smith and on movant's analysis of

weaknesses in the trial testimony of the witnesses described above.  (ECF No. 303-2 at 7-8.)

Movant argues, in general, that his trial proceedings were "flawed" because the trial testimony of

some of the prosecution witnesses, such as Martin Connors and Eric Chukes, was unreliable,

contradictory, and possibly perjurious.  (Id. at 11.)  He notes that only Andre Robinson testified

with regard to all of the counts brought against him.  (Id.)  Movant also points out that

prosecution witness Servidio did not mention movant's name when he was first asked by

government agents about his gun sales, but revealed only later that he sold the same type of

firearm to movant that was later used in the Golden One and other bank robberies.  (Id. at 17-18;

RT at 478, 467, 494.)  Movant argues that the testimony of the prosecution witnesses was not

credible because they received "benefits," or had other incentives to testify against him.  (ECF

No. 303-2 at 12.)

Movant claims that the prosecution's theory of the case against him was that Antonio

Servidio sold a MAC firearm to movant at Mr. Landers' home, which movant thereafter used in

all of the charged bank robberies.  (Id.)  Movant points to the Assistant U.S. Attorney's closing

argument to the jury that the sale of a MAC firearm to movant was strong circumstantial evidence

that movant participated in all of the robberies, including the robbery of Golden One Credit

Union.  (Id. at 16-17.)[5]  Movant argues that "the government built a substantial portion of its case

around the sale of the weapon by Servidio in order to directly connect Mr. Davis to the weapons

allegations and his alleged involvement in the crimes."  (ECF No. 319 at 27.)   Movant contends

that Landers' declaration, described above, refutes Servidio's trial testimony that movant bought

---

[5]  Specifically, during his closing argument to the jury the Assistant U.S. Attorney stated:

> You heard numerous tellers, numerous witnesses tell you from the Schools Employees Federal Credit Union, also from the surveillance photos from the U.S. Bank that a Mac-12 type weapon was used.  You don't have that kind of weapon pulled on you, put against your head and threatened to have your brains blown out and not remember certain characteristics of that gun.

> That is strong circumstantial evidence of Mr. Davis' guilt, the purchase of a Mac[-]12 to use for the Schools, Golden One, First Federal, Campbell Soup and the US Bank robberies.

(RT at 1697.)

a MAC-12 firearm at Landers' house. (ECF No. 303-2 at 13, 14.) In essence, movant argues that the affidavit of Latoine Landers proves that movant is innocent of the charges involving at least the Golden One Credit Union because it demonstrates he did not purchase a MAC firearm, as Servidio testified to at trial, and that therefore movant could not have brought such a weapon to the planning meeting(s) or used such a weapon in the bank robberies.

Movant informs the court that he attempted to obtain the state and federal records regarding sales of the weapon Mr. Servidio allegedly sold to movant but was unable to do so, even after he requested them from the prosecution. (Id. at 19.) Movant argues that the testimony at his trial demonstrated that the ATF records of gun purchases and sales were in some instances inaccurate, appeared to have been falsified by the gun dealers, and did not necessarily support the government's theory that he bought a MAC machine pistol on a specific date, as testified by Servidio. (Id. at 18-19; see also RT at 1278-95.) Movant also observes that "it seems odd" that the prosecution relied at trial on records maintained by the state instead of federal records to establish when the weapons used in the robberies were made and shipped to the gun dealer. (ECF No. 303-2 at 19.)

In another argument in support of his claim of actual innocence, movant informs the court that he "believes he saw" a photograph of the Golden One Credit Union robbery, in which one of the participants was carrying a simple handgun. (Id. at 12, 19.) Movant states that if such a photograph exists, it would impeach Marcel Swift's trial testimony that the robbers used MAC firearms during the robberies. (Id. at 12.) Movant explains that he has not been able to locate this photograph, in part because his trial counsel's file was destroyed. (Id. at 19.) Movant states that his current counsel

> obtained photographs and video of the Golden One robbery from the government; however, he was unable to reproduce the same photographs from the video as those photographs provided by the government. Counsel took the video to a local media firm and was informed that the video provided by the government was not copied correctly and that the video was compressed and that was why it was impossible to produce the same image from the same time stamp position in the video. Counsel sought discovery of the original tape but that motion was denied.

(Id.) Movant argues that this court should order an evidentiary hearing, at which the

1   government should be directed to produce "the bank video."  (ECF No. 319 at 32.)

2          Movant specifies how his general arguments, described above, affect each of the charges

3   against him.  He argues that the declarations of Jason Smith and Latione Landers are relevant to

4   show his innocence on Counts 1 and 2 involving the Golden One Credit Union robbery, and in

5   particular the "gun allegation."  ((ECF No. 319 at 8, 9, 10, 16, 25, 33.)  He argues that these

6   declarations refute the government's theory that movant purchased from Servidio the MAC

7   firearm that was later used in the robbery of Golden One.  Movant argues that Landers'

8   declaration shows that movant "was not even present at the meeting when Antonio Servidio

9   supposedly sold the gun which was a cornerstone of the government's allegations."  (Id. at 19.)

10  He further argues that Smith's declaration demonstrates that Swift's trial testimony that movant

11  brought a MAC-12 to the Golden One planning meeting was false.  (Id. at 14.)

12         Movant notes that Andre Robinson "did not specifically testify that Mr. Davis provided

13  any weapons for the Golden One robbery" but, rather, testified that he did not remember who

14  provided the guns for the robbery or exactly what type of guns they were.  (Id. at 34.)  Movant

15  also notes that Mr. Hernandez identified Terry Amons as the driver of the getaway van from the

16  photographic lineup and, at trial, was unable to identify movant as the driver of the van.  He

17  argues this contradicts the testimony of government witnesses who testified at trial that movant

18  was involved in those robberies.  (Id. at 9.)  Finally, movant argues that if he could find the

19  photograph in which one of the participants in the Golden One robbery was depicted holding a

20  handgun, it would contradict Swift's trial testimony that a MAC rifle was used in that robbery.

21  (Id. at 32, 34.)  Movant contends that, "at the very least, he prays this court will reverse the gun

22  allegations associated with the Golden One robbery since both Mr. Landers' and Mr. Smith's

23  along with Mr. Robinson's and Mr. Hernandez' testimony supports a finding that he is not guilty

24  of that charge."  (Id. at 32.)

25         With regard to Counts 5 and 6 involving the robbery of U.S. Bank, movant notes that

26  witness Erik Chukes refused to implicate movant in that crime, and denied that he had previously

27  told the prosecutor and government agents that movant was a perpetrator of that robbery.  (Id. at

28  12.)  With regard to Counts 7 and 8 involving the robbery of Schools Credit Union, movant notes

that witness Connors recanted his testimony given on direct examination that movant was one of the participants in that robbery.  (<u>Id.</u> at 13.)  Movant argues that these weaknesses in the trial testimony of witnesses Chukes and Connors demonstrates that movant is in fact innocent of the crimes charged in Counts 5, 6, 7, and 8 of the indictment.

With regard to his convictions on all of the counts against him generally, movant argues that Servidio's testimony 'affected all the counts and his testimony was impeached during the trial and Mr. Landers' declaration provides proof that Servidio committed perjury." (<u>Id.</u> at 8.) Movant argues that all of his convictions involved perjured testimony and coercion of witnesses by the government.  (<u>Id.</u> at 14.)  Specifically, he argues that the trial testimony of Chukes and Connors demonstrates that the trial witnesses "were under a great deal of pressure from the government to accuse Mr. Davis of being involved in these offenses." (<u>Id.</u>)  With regard to the prosecution's DNA evidence, movant contends that his casual contacts with the participants in the robberies, all of whom grew up in the same neighborhood, could have explained an innocent transfer of his DNA to the clothing of those who actually participated in those robberies.  (<u>Id.</u> at 15.)  Movant states that "the defense repeatedly was concerned about the DNA evidence being contaminated." (<u>Id.</u>)

Movant summarizes his claim of actual innocence as follows:  "Mr. Davis has cited to credible evidence in support of his claims which includes Mr. Smith's declaration and Andre Robinson's lack of testifying that Mr. Davis provided any weapons for the Golden One robbery in combination with the declaration from Mr. Landers which impeaches the government theory that Servidio sold the gun used in that robbery." (<u>Id.</u> at 16.)  Movant concludes:

> Since the court can consider the number of inconsistent statements by the government witnesses that originally excluded Mr. Davis as participating, plus the two witnesses who changed their testimony and testified that Mr. Davis did not participate, this evidence provides significant support for the court to overturn the other counts based on Mr. Davis' actual innocence claims regarding the other counts.

> Mr. Landers' declaration provides additional support since it demonstrates that another key government witness did not testify truthfully supports a finding that the verdict should be set aside and at a retrial all this evidence can be considered by the jury.

1    (Id. at 17.)  Movant argues, "the plain fact of the matter is that Mr. Davis did not buy any

2    weapons and the government obtained a conviction with perjured testimony."  (Id. at 27.)

3            In his answer, respondent argues that movant's claim of innocence is meritless.

4    Respondent notes that the claim is based largely on the declaration of movant's own cousin

5    Landers and that the Landers declaration is "untrustworthy, unreliable, and does not constitute

6    direct evidence of the defendant's innocence on the counts of conviction."  (ECF No. 317 at 6.)

7    Respondent notes that Landers' 2010 declaration is dated eight years after movant's trial took

8    place in 2002, even though Landers apparently knew all of the information contained in that

9    declaration right after Servidio testified.  (Id. at 15-16.)  Respondent contends that the Landers

10   declaration "does not provide for any timeframe, specific make of firearm, or any other detailed

11   facts that would support a finding of reliability and trustworthiness."  (Id. at 17.)  He also argues

12   that Landers' declaration does not have any bearing on whether movant is guilty of the robberies

13   for which he was convicted, but is relevant only to the issue of whether Servidio sold a gun to

14   Landers and movant at Landers' residence.  (Id.)

15           Respondent further argues that Landers' declaration is not reliable because he has a

16   motive to provide false testimony to benefit movant, his cousin.  (Id. at 17-18.)  Respondent

17   observes that the Landers declaration does not refute other evidence introduced at trial against

18   movant, including the testimony of witnesses Robinson and Swift, the DNA evidence, and

19   movant's own letter to Jason Smith's wife in which movant solicited Smith to exonerate movant

20   in the bank robberies, as mentioned above.  Respondent argues that movant's reliance on the trial

21   testimony of witnesses Hernandez, Chukes, and Connors is insufficient to demonstrate that he is

22   actually innocent of the robberies.  (Id.)  Respondent also contends that because the District Court

23   and Ninth Circuit Court of Appeals found that sufficient evidence introduced at trial supported

24   movant's convictions, "the doctrine of law of the case precludes Davis from re-litigating

25   sufficiency of the evidence."  (Id. at 6.)

26           The undersigned first notes that movant did not raise a claim of actual innocence on direct

27   appeal.  The United States Supreme Court has held, in the context of a § 2255 motion, that

28   "where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the

1   claim may be raised in habeas only if the defendant can first demonstrate either "cause" and

2   actual "prejudice" . . . or that he is "actually innocent." Bousley v. United States, 523 U.S. 614,

3   622 (1998). See also United States v. Avery, 719 F.3d 1080, 1083 (9th Cir. 2013). This is

4   because "habeas review is an extraordinary remedy and 'will not be allowed to do service for an

5   appeal.'" Bousley, 523 U.S. at 621 (citation omitted). See also United States v. Addonizio, 442

6   U.S. 178, 184 (1979) ("When Congress enacted § 2255 in 1948, . . . it did not purport to modify

7   the basic distinction between direct review and collateral review."); United States v. Berry, 624

8   F.3d 1031, 1038 (9th Cir. 2010) (The Supreme Court "has cautioned that § 2255 may not be used

9   as a chance at a second appeal."). Accordingly, "most claims are procedurally defaulted by both

10  federal and state prisoners in habeas proceedings when not raised on direct appeal, absent a

11  showing of cause and prejudice or actual innocence." United States v. Braswell, 501 F.3d 1147,

12  1150 n.1 (9th Cir. 2007). Under this standard, the term "actual innocence" means "factual

13  innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623 (1998). See also Avery, 719

14  F.3d at 1083.[6]

15      Movant argues that he should be allowed to pass through the "Schlup gateway" permitting

16  his actual innocence claims to be heard in this § 2255 motion. (ECF N0. 303-2 at 7-11.) In

17  Schlup v. Delo, 513 U.S. 298 (1995), the United States Supreme Court held that a federal habeas

18  petitioner "can overcome a procedural default, including a failure to comply with the statute of

19  limitations, by demonstrating actual innocence of the crime underlying his conviction." Vosgien

20  v. Persson, 742 F.3d 1131, 1134 (9th Cir. 2014) (citing Schlup, 513 U.S. at 313-15.) See also

21  McQuiggin v. Perkins, ___ U.S. ___, ___, 133 S. Ct. 1924, 1931-34 (2013) (a plea of actual

22  innocence can overcome the one-year statute of limitations for filing a federal habeas petition

23  under the AEDPA). A claim of actual innocence under Schlup is "not itself a constitutional

24  claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise

25  barred constitutional claim considered on the merits." Schlup, 513 U.S. at 315 (quoting Herrera

26  _____

27  [6] Independent claims of ineffective assistance of counsel, and claims that "could not be presented without further factual development" are excluded from the cause and prejudice requirement and may be heard on collateral review, even though the defendant could have, but did not raise the

28  claim on direct appeal. Massaro v. United States, 538 U.S. 500, 505 (2003).

1    v. Collins, 506 U.S. 390, 404 (    ).  See also Stewart v Cate, ___ F.3d ___, 2014 WL 1707033, at

2    *6 (9th Cir. May 1, 2014) (same).[7]

3           Respondent argues that the Schlup line of cases is not applicable here because movant is

4    not asserting any untimely claims or claims subject to a procedural default.  (ECF No. 324 at 1-2.)

5    In a supplemental filing with the court dated July 1, 2013, however, movant claims that he is

6    raising "a freestanding claim of actual innocence which is a substantive claim based on the

7    declarations of Mr. Landers and Mr. Smith, and the corroborating testimony of other witnesses as

8    noted in the pleadings."  (ECF No. 323 at 2.)

9           This court will assume that movant's claim of actual innocence, based in part on allegedly

10   newly discovered evidence, is cognizable in these § 2255 proceedings notwithstanding his failure

11   to raise such a claim on appeal.  Accordingly, the undersigned will address movant's purported

12   actual innocence on the merits.  In this regard, the court will construe movant's arguments as

13   supporting a "freestanding" claim of actual innocence – i.e., that, despite the lack of any

14   constitutional error at his trial, his incarceration is unconstitutional due to his actual innocence.

15   The court will address movant's "freestanding" claim of actual innocence below.

16                              **1.  Applicable Legal Standards**

17          The Supreme Court has, on several occasions, assumed, without expressly deciding, that a

18   "freestanding" claim of actual innocence is cognizable on federal habeas review.  See House v.

19   Bell, 547 U.S. 518, 554–55 (2006); Herrera v. Collins, 506 U.S. 390, 417 (1993).  The Ninth

20   Circuit has also assumed that freestanding actual innocence claims are cognizable on collateral

21   attack.  See e.g., Berry, 624 F.3d at 1038 n. 5 ("This circuit recognizes a claim of actual

22   innocence that is cognizable under § 2255."); Carriger v. Stewart, 132 F.3d 463, 476–77 (9th

23   Cir.1997) (en banc).  However, the standard for establishing that one is entitled to relief on such a

24   claim is "'extraordinarily high.'"  Carriger, 132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).

25   ────────────────────

     [7]   The applicable test is whether "a constitutional violation has probably resulted in the

26   conviction of one who is actually innocent."  Schlup 513 U.S. at 321.  Accord Murray v. Carrier,
     477 U.S. 478, 496 (1986).  "To establish the requisite probability, the petitioner must show that it

27   is more likely than not that no reasonable juror would have convicted him in the light of the new
     evidence."  Schlup 513 U.S. at 327.  See also Coley v. Gonzalez, 55 F.3d 1385, 1387 (9th Cir.

28   1995).

                                              20

1    In order to prevail, a petitioner "must go beyond demonstrating doubt about his guilt, and must

2    affirmatively prove that he is probably innocent." Id. See also Cooper v. Brown, 510 F.3d 870,

3    923 (9th Cir. 2007) ("Under these standards, a petitioner must affirmatively prove that he is

4    probably innocent."); Boyde v. Brown, 404 F.3d 1159, 1168 (9th Cir. 2005) (same).

5         Keeping in mind the demanding showing required and for the reasons set forth below, the

6    undersigned finds that movant has failed to show that he is probably innocent of the crimes for

7    which he was convicted and is therefore not entitled to relief on his freestanding claim of actual

8    innocence.

9         **2.  Movant's Conviction for Use of a Firearm during the Golden One Robbery**

10        As noted above, movant argues that, "at the very least," he is entitled to relief on his claim

11   involving his use of a firearm during the Golden One robbery.  (ECF No. 319 at 32.)  He argues

12   that the affidavits of Landers and Smith submitted in support of his § 2255 motion demonstrate

13   that he is innocent of that charge.

14        Movant was convicted of violating 18 U.S.C. § 924(c) in connection with the Golden One

15   robbery, under a theory of aiding and abetting.  Section 924(c) provides additional mandatory

16   consecutive penalties for using a firearm during "any crime of violence or drug trafficking crime

17   . . . for which he may be prosecuted in a court of the United States."  In order to be found guilty

18   of aiding and abetting under § 924(c), "the defendant must have 'directly facilitated or

19   encouraged the use' of the firearm" and not simply be aware that a firearm was being used.

20   United States v. Bancalari, 110 F.3d 1425, 1429-30 (9th Cir. 1997).  If the defendant "knew

21   before the robberies that a gun *would* be used," as opposed to "mere knowledge at the scene" that

22   a firearm was being used, this foreknowledge "may support a conviction for aiding and abetting."

23   United States v. Nelson, 137 F.3d 1094, 1103 (9th Cir. 1998) (citing United States v. Salazar, 66

24   F.3d 723, 729 (5th Cir. 1995)).[8]  Thus, "if a defendant knew before the crime that a gun would be

25   _____

26   [8]  The Supreme Court has recently addressed this issue in the following way:

27        An active participant in a drug transaction has the intent needed to
          aid and abet a § 924(c) violation when he knows that one of his
          confederates will carry a gun.  In such a case, the accomplice has
28        decided to join in the criminal venture, and share in its benefits,

1   used and acted to facilitate or encourage that use, a jury may more easily be able to infer that the

2   defendant specifically intended to aid the use of a firearm." Id. at 1103-04.  On the other hand, "a

3   defendant's mere presence during the planning of the robbery and agreement to that plan in

4   general does not show direct facilitation or encouragement of the firearm in particular." Nelson,

5   137 F.3d at 1104.  There must be evidence that the defendant facilitated or encouraged the use of

6   the firearm, and not merely the overall robbery. Id.

7           As explained above, movant argued on appeal that the evidence introduced at his trial was

8   insufficient to support his conviction on the charge of aiding and abetting the using of a firearm in

9   connection with the robbery of the First Federal Credit Union.  The Ninth Circuit Court of

10  Appeal, relying on the decision in Nelson, agreed with movant's arguments and reversed his

11  

12      with full awareness of its scope - that the plan calls not just for a
        drug sale, but for an armed one. In so doing, he has chosen (like the
13      abettors in Pereira and Bozza or the driver in an armed robbery) to
        align himself with the illegal scheme in its entirety - including its
14      use of a firearm. And he has determined (again like those other
        abettors) to do what he can to "make [that scheme] succeed." Nye
15      & Nissen, 336 U.S. at 619, 69 S. Ct. 766.  He thus becomes
        responsible, in the typical way of aiders and abettors, for the
16      conduct of others.  He may not have brought the gun to the drug
        deal himself, but because he took part in that deal knowing a
17      confederate would do so, he intended the commission of a § 924(c)
        offense - i.e., an armed drug sale.

18      For all that to be true, though, the § 924(c) defendant's knowledge
        of a firearm must be advance knowledge - or otherwise said,
19      knowledge that enables him to make the relevant legal (and indeed,
        moral) choice.   When an accomplice knows beforehand of a
20      confederate's design to carry a gun, he can attempt to alter that plan
        or, if unsuccessful, withdraw from the enterprise; it is deciding
21      instead to go ahead with his role in the venture that shows his intent
        to aid an armed offense. But when an accomplice knows nothing of
22      a gun until it appears at the scene, he may already have completed
        his acts of assistance; or even if not, he may at that late point have
23      no realistic opportunity to quit the crime.  And when that is so, the
        defendant has not shown the requisite intent to assist a crime
24      involving a gun.  As even the Government concedes, an unarmed
        accomplice cannot aid and abet a § 924(c) violation unless he has
25      "foreknowledge that his confederate will commit the offense with a
        firearm."  Brief for United States 38; see also infra, at 1250 - 1252.
26      For the reasons just given, we think that means knowledge at a time
        the accomplice can do something with it - most notably, opt to walk
27      away.

28  Rosemond v. United States, ___U.S.___, ___ 134 S. Ct. 1240, 1249 (2014)

1    conviction on that charge, reasoning that "the only evidence the government presented to support

2    that theory was that Davis knew that guns were going to be used in the robbery and may have

3    been present for a discussion concerning how the robbery was to be conducted." Davis, 138 Fed.

4    Appx. at 915.

5            The evidence submitted at trial with respect to movant's use of a firearm in violation of

6    §924(c) in connection to the Golden One robbery was of a different character however.  Through

7    the trial testimony of Marcel Swift, it was established that movant participated in a planning

8    meeting prior to the Golden One robbery, at which the participants discussed "what we was going

9    to do, who was going to do what."  (RT at 1511.)  Swift also testified that movant brought a

10   MAC-11 firearm to that meeting.  (Id. at 1511-12.)  Based upon this evidence a reasonable jury

11   could find that movant knew before the Golden One robbery that a firearm would be used in that

12   robbery and that he facilitated or encouraged that use of a firearm by bringing a MAC-11 firearm

13   to the planning meeting for that robbery.  See United States v. Hungerford, 465 F.3d 113, 1117

14   (9th Cir. 2006) (evidence was sufficient to support a § 924(c) conviction on an aiding and

15   abetting theory where the defendant helped plan the robberies, scouted potential targets, had

16   knowledge that her co-conspirator was carrying out the robberies, and willingly accepted the

17   proceeds of the crimes).

18           Latione Landers declares that Servidio did not sell a firearm to movant at Landers' house.

19   (ECF No. 319-2.)  Even taken as true, this declaration would establish only that the MAC-11

20   brought by movant to the Golden One robbery planning meeting was not purchased by movant at

21   Landers' house from Servidio.  The Landers declaration neither disproves nor discredits Swift's

22   testimony that movant brought a MAC-11 weapon to the planning meeting.  In other words, even

23   if movant did not purchase a MAC-11 at Landers' house, he obviously still could have purchased

24   or obtained one elsewhere and brought it to the robbery planning meeting, knowing it would be

25   used in the robbery of Golden One or thereby encouraging the use of firearms in the commission

26   of that robbery.

27           Jason Ellis Smith declares in conclusory fashion and without elaboration, that movant "did

28   not provide the weapons used in the armed robbery of the Golden One Credit Union."  (ECF No.

1    319-1.)  This cursory statement is insufficient to counter the far more specific testimony of

2    Marcel Swift that movant brought a MAC-11 to the planning meeting and participated at that time

3    in a discussion about the specifics of the Golden One robbery.  As with the Landers declaration

4    relied upon by movant, Smith's declaration certainly does not affirmatively prove that movant is

5    probably innocent of the charge of using a firearm during, or possessing a firearm in the

6    furtherance of, the Golden One Credit Union robbery.

7         Even when considered together, the "new" evidence provided by Smith and Landers in

8    their declarations upon which movant relies is insufficient to meet the "extraordinarily high"

9    standard set for establishing that movant is innocent of using a firearm in connection with the

10   robbery of the Golden One Credit Union, as that crime is defined in 18 U.S.C. § 924(c).  In light

11   of the other evidence introduced at movant's trial which supports his conviction on that charge,

12   the undersigned finds that movant has failed to make a "truly persuasive demonstration" that he is

13   innocent with respect to that offense.[9]  Herrera, 506 U.S. at 417.  Accordingly, he is not entitled

14   to relief on that claim.

15              **3. Movant's Other Convictions**

16        Movant has also failed to "affirmatively prove" that he is "probably innocent" of the other

17   charges of which he was convicted at trial.  Carriger, 132 F.3d at 476.  It is true that Robinson and

18   Swift originally identified someone other than movant as one of the perpetrators of the robberies,

19   that Chukes refused to identify movant as one of the participants in the U.S. Bank robbery, and

20   that Connors recanted his testimony implicating movant in the Schools Federal Credit Union

21   robbery.  However, despite these circumstances, there was significant additional evidence

---

[9]  A weakness that plagues all of movant's actual innocence arguments is his apparent lack of
appreciation of the demanding standard he must meet to be entitled to relief on such claims.  To
no avail, petitioner spends much time focusing on what he perceives as inconsistencies
(especially with respect to the firearms used in the robberies) or weaknesses in the evidence upon
which the jury convicted him.  However, pointing out mere inconsistencies in the trial testimony
of witnesses is clearly insufficient to obtain such relief.  See e.g. Washington v. Artus, No. 07 Civ
7769 (DAB), 2014 WL 774970, at *4 (S.D.N.Y. Feb. 25, 2014) ("While there were
inconsistencies among the trial witnesses' testimony, because Witnesses A, B, and C lacked
credibility, Petitioner has not demonstrated actual innocence under the Herrera standard;
moreover, a reasonable juror could find Petitioner guilty if presented with the testimony of
Witnesses A, B, and C in addition to the evidence presented at trial.")

1    introduced at movant's trial implicating him in the commission of all the crimes of conviction,

2    including the testimony of Robinson and Swift, DNA evidence, and movant's letter Jason Smith's

3    wife in which movant asked Smith to exculpate him of the robberies.  The jury apparently

4    believed all of this other evidence and found movant guilty of the charged offenses

5    notwithstanding the weaknesses in the testimony of other government witnesses pointed out by

6    movant.  After considering the Landers and Smith declarations, both Hernandez' trial testimony

7    and his failure to pick movant out of a lineup, and movant's assertion that he believes he at one

8    time saw, or "probably" saw, a photograph showing that one of the participants in the Golden

9    One robbery had a handgun, this court concludes that movant has failed to present a "truly

10    persuasive claim" that he is factually innocent of any of the charges upon which he was

11    convicted.  Herrera, 506 U.S. at 417.  Accordingly, he is not entitled to relief on his claim of

12    actual innocence.[10]

13    **4.  Request for Discovery/Evidentiary Hearing**

14    Movant also requests an evidentiary hearing and further discovery in order to "recreate"

15    his trial counsel's files and to obtain evidence in support of his claim of actual innocence.  (ECF

16    No. 303-2 at 23.)  Specifically, he requests:  (1) an evidentiary hearing, at which he, his trial

17    counsel, and several witnesses called at his trial would testify; (2) discovery of phone records and

18    bank records; (3) discovery of records that might demonstrate whether "witnesses against Mr.

19    Davis" had a motive to implicate him in the charged crimes; (4) discovery of records that might

20    demonstrate the reasoning for his trial counsel's tactical decisions; (5) the video of the robbery at

---

[10]  In his amended traverse, movant appears to claim that the evidence introduced at his trial was insufficient to support his convictions.  (ECF No. 319 at 15-16.)  Movant acknowledges "that regarding a Jackson v. Virginia sufficiency of the evidence analysis, the declarations of Mr. Smith and Mr. Landers only provides relief for the counts associated with the Golden One robbery." (Id. at 17, 32.)  Movant also concedes that "the Jackson standard presents difficulties in obtaining relief from the bank robbery convictions."  (Id. at 32)  Movant informs the court, that he sought direct appellate review of the sufficiency of the evidence introduced at his trial to support all of his convictions.  (Id.)  See Davis, 138 Fed. Appx. at 914-15.)  Of course, issues disposed of on a previous direct appeal are not reviewable in a subsequent § 2255 proceeding.  United States v. Redd, 759 F.2d 699, 701 (9th Cir. 1985); United States v. Currie, 589 F.2d 993, 995 (9th Cir. 1979).  Accordingly, any claim that movant's convictions were not supported by sufficient evidence is not cognizable in the instant § 2255 motion.  Id.  In any event, any such claim would lack merit for the same reasons set forth above in addressing movant's actual innocence claim.

1   Golden One Credit Union, in order to demonstrate that the robbers were using handguns as

2   opposed to a MAC-11; and (6) discovery of state and federal records involving sales of the

3   weapon movant allegedly purchased from Servidio.  (ECF No. 303-2 at 7-8, 19-21; ECF No. 319

4   at 7, 20-21, 32.)  Movant also explains that an evidentiary hearing would "allow the court to view

5   the original Golden One video and to hear testimony from the various witnesses related to the

6   disputed evidence which the government asserted was not trustworthy and/or dependable."  (ECF

7   No. 315 at 7.)

8           District courts, for good cause, may authorize parties to a § 2255 habeas proceeding to

9   conduct discovery.  Rule 6(a) of the Rules Governing Section 2255 Proceedings for the U.S. Dist.

10  Cts.  Good cause under Rule 6(a) exists "where specific allegations before the court show reason

11  to believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is . . .

12  entitled to relief . . . ."  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson,

13  394 U.S. 286, 300 (1969)).  However, habeas petitioners may not "use federal discovery for

14  fishing expeditions to investigate mere speculation."  Calderon v. U.S. Dist. Court, 98 F.3d 1102,

15  1106 (9th Cir. 1996).  See also Kemp v. Ryan, 638 F.3d 1245, 1260 (9th Cir. 2011) ("Kemp's

16  claim of a jail-wide policy of eliciting incriminating statements has many of the indicia of an

17  improper 'fishing expedition,' and the desire to engage in such an expedition cannot supply 'good

18  cause' sufficient to justify discovery."); Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999)

19  (petitioners may not seek to use discovery as a "fishing expedition . . . to explore their case in

20  search of its existence.") (quoting Calderon v. U.S.D.C. (Nicolaus), 98 F.3d 1102, 1106 (9th Cir.

21  1996)).  Similarly, "good cause for discovery cannot arise from mere speculation" and "discovery

22  cannot be ordered on the basis of pure hypothesis."  Arthur v. Allen, 459 F.3d 1310, 1311 (11th

23  Cir. 2006).  Finally, the availability of relief under § 2255 does not properly offer a criminal

24  defendant an "'opportunity' to reargue their entire case."  United States v. Schaflander, 743 F.2d

25  714, 722 (9th Cir. 1984).

26          In essence, movant is seeking to obtain wide-ranging discovery on the off-chance that it

27  might provide evidence that supports his claims.  In part, movant wishes to re-visit the testimony,

28  including the cross-examination, of certain trial witnesses, and to investigate his case anew.  The

discovery rules applicable to § 2255 proceedings do not permit such a wide ranging exercise, nor do they allow a petitioner to investigate his entire case anew after he has been convicted. Movant's argument that he might be able to find evidence to support his claims of actual innocence if he were to obtain additional discovery or is granted an evidentiary hearing is based entirely on speculation and hypothesis.

The undersigned concludes that no additional factual supplementation is necessary in this case and that neither an evidentiary hearing nor further discovery is appropriate with respect to the claims raised in the motion pending before this court. Movant has not demonstrated good cause to conduct the discovery that he seeks. Therefore, his request for an evidentiary hearing and further discovery should be denied.

**C. Ineffective Assistance of Counsel**

In his next ground for relief, movant claims that his trial counsel rendered ineffective assistance in failing to interview Latione Landers to determine whether he could refute Servidio's testimony that movant bought a gun at Landers' residence. Movant also faults his trial counsel for failing to call Landers as a witness at his trial. (ECF No. 303-2 at 21.) In this regard, movant argues that Landers' testimony could have cast "additional doubt on the government's entire case" and was therefore "material." (ECF No. 303-2 at 23; ECF No. 319 at 36.) He reasons as follows:

> Here, trial counsel failed to investigate evidence related to a material issue. The government repeatedly placed Mr. Landers at the place and time when the alleged weapon used in all the crimes according to the government's theory of the case. Mr. Landers asserts trial counsel failed to even contact him. The government during the trial alerted the defense that it could have called him to testify. Mr. Landers refutes the government's only witness who testified that Mr. Davis purchased a weapon from Servidio – Servidio himself. Servidio['s] testimony was inconsistent and the defense brought up his prior felony conviction; however, the defense did not present testimony from the individual who the government repeatedly asserted was present, too – Mr. Landers.

(ECF No. 303-2 at 23.)

Respondent, on the other hand, argues that movant's trial counsel had a tactical reason for not calling Mr. Landers as a trial witness. Respondent notes that several affidavits attached to

1   movant's § 2255 motion reflect that Landers told movant's mother and sister, as he left the

2   courtroom after listening to Servidio's testimony, that Servidio was lying.  (See ECF Nos. 319-3,

3   319-4.)  Movant's mother also declares that movant told her he had talked to his trial attorney and

4   "told him he should contact Latione Landers."  (ECF No. 319-3.)  Respondent argues that, given

5   this evidence, it is clear movant's trial counsel was aware of Landers' as a potential witness but

6   decided, as a tactical matter, not to call him as a defense witness at trial.  Respondent suggests the

7   following viable reasons for such a tactical decision by movant's trial counsel:  (1) Landers is

8   movant's cousin and therefore had a motive to testify falsely in order to help movant and could be

9   impeached on that basis; (2) Landers was subject to impeachment based on his prior criminal

10  record; (3) Landers might have refused to take the witness stand in order to avoid exposing

11  himself to criminal prosecution if he committed perjury; and (4) Landers' credibility had already

12  been negatively impacted by Servidio's testimony that Landers was involved in the illegal sale of

13  firearms to movant.  (ECF No. 317 at 17-18.)

14       Respondent notes that movant's counsel was given a nine-day trial continuance to prepare

15  for his cross-examination of Servidio.  Respondent argues,

16       it is inconceivable that during the nine days the trial court permitted
         the defense to prepare for cross-examination of Servidio that Davis
17       and his trial counsel would not have engaged in an extended
         conversation of how to cross-examine Servidio and whether or not
18       to call Landers as a defense witness on this matter.

19  (Id. at 17.)  Respondent also argues that movant's trial counsel may have decided Landers'

20  potential testimony was not particularly helpful to the defense, given that it would not provide

21  direct evidence that movant was innocent of the robberies themselves but would have only

22  addressed  whether Servidio sold a gun to movant at Landers' house.  (Id.)

23       The clearly established federal law for ineffective assistance of counsel claims is

24  Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant

25  must show that (1) his counsel's performance was deficient and that (2) the "deficient

26  performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or

27  her representation "fell below an objective standard of reasonableness" such that it was outside

28  "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal

1    quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

2    fair trial, a trial whose result is reliable.'"  Harrington v. Richter, ___, U.S.___, ___, 131 S. Ct.

3    770, 787-88 (2011) (quoting Strickland, 466 U.S. at 687).

4        A reviewing court is required to make every effort "to eliminate the distorting effects of

5    hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

6    conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 669; see Richter, 131 S.

7    Ct. at 789.  Reviewing courts must also "indulge a strong presumption that counsel's conduct falls

8    within the wide range of reasonable professional assistance."  Hedlund v. Ryan, 750 F.3d 793,

9    809 (9th Cir. 2014) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong

10   presumption that counsel "exercised acceptable professional judgment in all significant decisions

11   made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

12   A reviewing court must also give counsel "the benefit of the doubt," and must "affirmatively

13   entertain the range of possible reasons [defense] counsel may have had for proceeding as they

14   did."  Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks

15   and alterations omitted).

16       The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

17   conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

18   simply reasonableness under prevailing professional norms.'"  Wiggins, 539 U.S. at 521 (quoting

19   Strickland, 466 U.S. at 688).  However, "general principles have emerged regarding the duties of

20   criminal defense attorneys that inform [a court's] view as to the 'objective standard of

21   reasonableness' by which [a court must] assess attorney performance, particularly with respect to

22   the duty to investigate."  Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005).  For instance,

23   "strategic choices made after thorough investigation of [the relevant] law and facts relevant to

24   plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  However, as the

25   Supreme Court has explained:

26            [S]trategic choices made after less than complete investigation are
              reasonable precisely to the extent that reasonable professional
27            judgments support the limitations on investigation.  In other words,
              counsel has a duty to make reasonable investigations or to make a
28            reasonable   decision   that   makes   particular   investigations

unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances.

Wiggins v. Smith, 539 U.S. 510, 521 2003) (quoting Strickland, 466 U.S. at 690-91).

Accordingly, counsel must, "at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)).  See also Porter v. McCollum, 558 U.S. 30, ___, 130 S. Ct. 447, 453 (2009) (counsel's failure to take "even the first step of interviewing witnesses or requesting records" and ignoring "pertinent avenues for investigation of which he should have been aware" constituted deficient performance).  On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient.  See Siripongs v. Calderon, 133 F.3d 732, 734 (9th Cir. 1998) (Siripongs II); Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  Furthermore, "'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'"  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel did not render ineffective assistance in failing to investigate or raise an argument on appeal where "neither would have gone anywhere")

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792.

After a careful review of the record, the undersigned concludes that movant has failed to demonstrate that he received ineffective assistance of counsel with respect to his trial counsel's failure to interview Landers and/or to call Landers as a witness at trial.  First, there is no evidence before this court that Landers would have testified at movant's trial if called or that he would

30

1    have testified consistently with the statements in his affidavit now filed in support of the instant

2    motion.  Further, as noted by respondent, movant's trial counsel was aware, because he was told

3    by movant, that Landers believed Servidio had lied on the witness stand.  This suggests that trial

4    counsel decided, for tactical reasons, not to call Landers as a witness.  Finally, as outlined above,

5    there was substantial evidence admitted at trial supporting movant's conviction on the charges

6    brought against him.

7         Under all of these circumstances, movant has failed to demonstrate either deficient

8    performance on the part of his trial counsel or prejudice.  See United States v. Harden, 846 F.2d

9    1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a

10   witness where the witness would have been subject to impeachment, there was no evidence in the

11   record that the witness would have testified at defendant's trial, and defendant was not prejudiced

12   in light of the overwhelming evidence against him).  The court also notes that Landers'

13   declaration does not impeach the testimony of the many other trial witnesses who described

14   movant's participation in the robberies of which he was convicted.  There is, therefore, no

15   reasonable probability that, but for trial counsel's failure to call Landers as a witness, the result of

16   movant's trial would have been different.

17        Indulging the strong presumption that the performance of movant's trial counsel falls

18   within the wide range of reasonable professional assistance, the undersigned concludes that

19   counsel did not render ineffective assistance in failing to interview and call Landers as a witness

20   at movant's trial.  Accordingly, movant is not entitled to relief on that claim.

21        **D.  Prosecutorial Misconduct**

22        In his third ground for relief, movant claims that the prosecutor in his case "failed to

23   exercise [his] duties as outlined in Berger v. United States, 295 U.S. 78 (1935)."  Specifically,

24   movant argues that the prosecutor improperly proceeded with movant's trial in the face of

25   evidence that movant was not guilty of the charged crimes.  (ECF No. 303-2 at 23.)

26        In Berger, the Supreme Court held a prosecutor's duty "is not only to use every legitimate

27   means to bring about a just conviction, but to refrain from improper methods calculated to

28   produce a wrongful conviction."  295 U.S. at 628.  Movant argues that the prosecutor in his case

31

1  violated that rule by:  (1) applying undue pressure on Erik Chukes and Martin Connors to

2  implicate movant in the charged crimes; (2) improperly relying on Antonio Servidio and other

3  witnesses to support the prosecution theory of the case even though their trial testimony and

4  pretrial statements regarding movant's involvement in the charged crimes were "inconsistent;" (3)

5  arguing that the defense could have called Latione Landers as a trial witness but failing to call

6  Landers as a prosecution witness; (4) failing to provide sufficient information so that movant

7  could find the photograph that he remembers seeing of at least one of the participants in the

8  Golden One robbery using a handgun instead of a MAC firearm; and (5) unfairly implying that

9  improper behavior by spectators in the courtroom during trial was movant's fault.  (ECF No. 303-

10  2 at 23-24, 319 at 23-24.)  Movant contends that in order to comply with the holding of Berger,

11  the prosecutor should have made "more of an effort" to resolve these issues and should "join the

12  defense [in requesting] an evidentiary hearing to review the records to make sure the conviction is

13  not based on perjured testimony from individuals who freely admitted to committing other violent

14  crimes but were given deals to cooperate and testify against Mr. Davis."  (ECF No. 303-2 at 24.)

15  Movant argues that "the search for the truth in this matter was subjugated to the government's

16  desire to win."  (Id.)

17      Movant also cites to the Supreme Court's decision in Imbler v. Pachtman, 424 U.S. 409,

18  426 n.24 (1976), arguing that "after a conviction the prosecutor also is bound by the ethics of his

19  office to inform the appropriate authority of after-acquired or other information that casts doubt

20  upon the correctness of the conviction."[11]  (ECF No. 319 at 23.)  In a supplemental brief, movant

21  claims that "issues related to the new evidence" (the Landers and Smith affidavits) give rise to

22

---

23  [11]  In Imbler, the United States Supreme Court noted that:

24              A prosecutor often must decide, especially in cases of wide public
              interest, whether to proceed to trial where there is a sharp conflict in
25              the evidence. The appropriate course of action in such a case may
              well be to permit a jury to resolve the conflict. Yet, a prosecutor
26              understandably would be reluctant to go forward with a close case
              where an acquittal likely would trigger a suit against him for
27              damages.

28  Imbler, 424 U.S. at 426 n.24.

1    claims based on Napue v. Illinois, 360 U.S. 264 (1959) and Brady v. Maryland, 373 U.S. 83

2    (1963).  (ECF No. 323.)  Movant argues, in general, that the prosecutor in his case was overly

3    zealous in his attempt to obtain a guilty verdict and ignored signs that movant might be innocent

4    of the charged crimes.

5         It is not clear whether movant raised this claim of prosecutorial misconduct on direct

6    appeal.  Assuming arguendo that the claim is cognizable in this § 2255 motion proceeding and

7    that it is independent of movant's claim of actual innocence, it nonetheless lacks merit and should

8    be rejected.

9         A violation of a defendant's right to due process occurs if the government knowingly uses

10   false evidence or fails to correct false testimony.  Napue, 360 U.S. at 269; Morales v. Woodford,

11   388 F.3d 1159, 1179 (9th Cir. 2004).  "To establish a Napue claim, a petitioner must show that

12   '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have

13   known that the testimony was actually false, and (3) . . . the false testimony was material.'"

14   Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010) (quoting United States v. Zuno–Arce, 339

15   F.3d 886, 889 (9th Cir. 2003)).  Mere speculation regarding these factors is insufficient to meet

16   petitioner's burden.  United States v. Zuno-Arce, 209 F.3d 1095, 1103 (9th Cir. 2000)

17   (speculation is not a basis for an evidentiary hearing on a Napue claim), overruled on other

18   grounds by Valerio v. Crawford, 306 F.3d 742, 763-64 (9th Cir. 2002) (en banc).

19        In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that

20   the suppression by the prosecution of evidence favorable to an accused upon request violates due

21   process where the evidence is material either to guilt or to punishment, irrespective of the good

22   faith or bad faith of the prosecution."  There are three components of a Brady violation:  "[t]he

23   evidence at issue must be favorable to the accused, either because it is exculpatory, or because it

24   is impeaching; the evidence must have been suppressed by the State, either willfully or

25   inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82

26   (1999).  See also Skinner v. Switzer, ___U.S. ___, ___, 131 S. Ct. 1289, 1300 (2011); Banks v.

27   Dretke, 540 U.S. 668, 691 (2004); Maxwell v. Roe, 628 F.3d 486, 509 (9th Cir. 2010).  The rule

28   of Brady applies in a situation where "the undisclosed evidence demonstrates that the

1   prosecution's case includes perjured testimony and that the prosecution knew, or should have

2   known, of the perjury." United States v. Agurs, 427 U.S. 97, 103 (1976).

3       Here, movant has failed to demonstrate that the government knew or should have known

4   that any trial testimony which it presented was false.  Indeed, movant himself notes that "there is

5   no proof that the government intentionally allowed perjured testimony to be introduced." (ECF

6   No. 319 at 23.)  Accordingly, movant is not entitled to relief on a claim based on the Supreme

7   Court's decision in Napue.

8       Petitioner has also failed to establish that the prosecutor committed a Brady violation in

9   connection with movant's conviction.  There is no evidence before this court suggesting that the

10  prosecutor withheld material exculpatory information from the defense.  The court also notes that

11  to the extent movant attempts to base his claim on the prosecution's alleged failure to tell the

12  defense that Landers believed Servidio had lied during his trial testimony, he cannot establish that

13  he suffered any prejudice since movant had already been informed by his mother of Landers'

14  expressed opinion that Servidio had testified falsely.

15      With regard to movant's arguments based on the Supreme Court's decision in Berger,

16  there is simply no evidence in this case that the prosecutor knowingly proceeded with the

17  prosecution against movant even though the prosecutor knew or suspected that movant was

18  innocent of the charges.  It is clear that the prosecutor believed in 2002, and still believes, that

19  movant is guilty of the crimes with which he was charged and convicted.  Further, movant's

20  allegations that the prosecutor used unfair or coercive tactics in preparing and presenting the

21  government's case are not supported by credible evidence in the record and do not rise to the

22  level of a federal constitutional violation.[12]  Nor is there any evidence that the prosecutor

23  _____

24  [12]  In advancing this argument movant relies primarily on the trial testimony of Chukes (who
    refused to identify movant as one of the robbers after doing so in interviews with law

25  enforcement and suggested that he had been pressured by the prosecution to implicate movant)
    and Connors (who on cross-examination recanted his testimony on direct implicating movant and

26  also suggested that he had been pressured by the government).  Of course, the government
    contends, as it did at trial, that Chukes and Connors balked at implicating movant in their trial

27  testimony only because they were afraid of him.  There is no evidence of misconduct on the part
    of the prosecution before this court.  In any event, any drama surrounding the testimony of

28  Chukes and Connors and whether it was the product of government pressure (proper or not) or

1   committed misconduct in failing to respond to movant's newly acquired evidence by entering into

2   a joint request for an evidentiary hearing.  Indeed, respondent's position is that the declarations

3   signed by Latione Landers and Jason Ellis Smith are themselves perjurious.  (ECF No. 324 at 4.)

4          For all of these reasons, the undersigned concludes that movant is not entitled to relief on

5   his claim that the prosecutor violated his duty to "refrain from improper methods calculated to

6   produce a wrongful conviction."  Berger, 295 U.S. at 628.

7          **E.  Movant's Sentence**

8          In his final claim for relief, movant argues that the sentence imposed in his case violates

9   his Fourteenth Amendment rights to due process and equal protection.  Specifically, movant

10  argues that his sentence is improperly based on the trial court's unsubstantiated belief that he was

11  involved in threats and intimidation against trial witnesses.  Movant also claims that his "prior

12  juvenile adjudication that resulted in a homicide" was a factor in the sentenced imposed upon him

13  here, and that he received a lengthy prison sentence because he "challeng[ed] the government's

14  case." (ECF No. 303-2 at 24-25.)  Movant notes in this regard that his co-defendants received

15  "lessor sentences."  (Id. at 25.)  However, movant cites no legal authority in support of these

16  arguments.

17         Again, it is not clear whether movant raised his present challenge to his sentence on direct

18  appeal.  However, assuming arguendo that the claim is cognizable in these § 2255 motion

19  proceedings, it should be rejected.

20         There is no evidence before this court supporting movant's claim that the trial judge relied

21  on improper considerations in imposing sentence on movant after the second remand from the

22  Ninth Circuit for re-sentencing.  In this regard, the undersigned notes that the transcript of

23  movant's 2009 sentencing has not been lodged with the court by either party.  In any event,

24  movant has simply not come forward with any evidence that supports his claims regarding the

25  trial judge's motives for imposing sentence.  As respondent contends, the sentence imposed in

26

27  fear of reprisal from movant, played out before the jury.  Accordingly, as with the rest of the
    evidence introduced at trial, the jury was allowed to assess its credibility and accept or reject it in

28  whole or in part.

1  movant's case appears to have been based on consideration of the applicable U.S. Sentencing

2  Guidelines and the sentence ultimately imposed appears to fall within the range provided

3  following an appropriate guideline calculation.  Accordingly, movant is not entitled to relief on

4  his claim attacking his sentence.

5        On August 22, 2013, movant filed a document entitled "Motion to Reopen and Amend 28

6  U.S.C. § 2255 motion."  Therein, movant's counsel requested leave to file additional briefing

7  addressing the recent Supreme Court decisions in Alleyne v. United States, ___ U.S. ___, 133 S.

8  Ct. 2151 (2013) and Descamps v. United States, ___ U.S. ___, 133 S. Ct. 2276 (2013), and "to

9  expand upon the issues related to" movant's sentencing claim.  (ECF No. 326 at 1.)  This court

10  denied movant's request to file additional briefing, but advised that it would consider the Alleyne

11  and Descamps decisions when issuing findings and recommendations addressing movant's §

12  2255 motion.

13        In Alleyne, the United States Supreme Court held that a finding as to whether the

14  defendant had brandished, as opposed to merely carried, a firearm in connection with a crime of

15  violence was an element of the offense that had to be found by a jury because the finding as to

16  that fact would elevate the mandatory minimum term for the offense.  Alleyne, 133 S. Ct. at 2151.

17  In Descamps, the Supreme Court held that courts may not apply the modified categorical

18  approach to sentencing under the Armed Career Criminal Act (ACCA) when the crime of which

19  the defendant was convicted has a single, indivisible set of elements.  Descamps, 133 S. Ct. at

20  2276; see also Aguilar-Turcios v. Holder, 740 F.3d 1294, 1299 (9th Cir. 2014) ("The Supreme

21  Court subsequently . . . . held that sentencing courts may not apply the modified categorical

22  approach when a defendant's statute of conviction contains an indivisible set of elements.")  In

23  short, the decisions in Alleyne and/or Descamps do not have any bearing on movant's challenges

24  to his sentence set forth in his § 2255 motion before this court and do not entitle him to relief

25  even when considered independently.

26  **V.  Motion for Nunc Pro Tunc Order**

27        Back on June 30, 2011, movant filed a motion for an order "designating that Mr. Davis

28  filed his Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Federal Sentence by a

1  Person in Federal Custody on June 28, 2011," and not on June 30, 2011, as appears on the court

2  docket.  (ECF No. 259.)  Therein, movant's counsel explains his good faith efforts to file the §

3  2255 motion using the court's CM/ECF system on June 28, 2011 and his belief on that date that

4  he had successfully done so.  Respondent has never filed any opposition to this motion.

5  Accordingly, movant's motion for a nunc pro tunc order will be granted.

6  **VI.  Conclusion**

7      Accordingly, IT IS ORDERED that movant's June 30, 2011 motion for a "nunc pro tunc

8  order to designate motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a

9  person in federal custody as filed on June 28, 2011" (ECF No. 259) is granted.

10      IT IS HEREBY RECOMMENDED that movant's motion pursuant to 28 U.S.C. § 2255

11  be denied.

12      These findings and recommendations are submitted to the United States District Judge

13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14  after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17  shall be served and filed within fourteen days after service of the objections.  Failure to file

18  objections within the specified time may waive the right to appeal the District Court's order.

19  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

20  1991).  In his objections movant may address whether a certificate of appealability should issue in

21  the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing

22  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

23  enters a final order adverse to the applicant).

24  Dated:  July 1, 2014

25

26      _____

27  DAD:8                            DALE A. DROZD
   davis114.2255                     UNITED STATES MAGISTRATE JUDGE

28